UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| Catamount Radiology, P.C., and | : | |
| Scott D. Smith, M.D., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Case No. 1:14-cv-213 |
| | : | |
| Yvette Bailey, M.D., | : | |
| | : | |
| Defendant. | : | |
| | : | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | : | |
| | : | |
| Yvette Bailey, M.D., | : | |
| | : | |
| Counterclaim Plaintiff | : | |
| And Third-Party Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| Scott D. Smith, M.D.; Catamount | : | |
| Radiology, P.C.; Joseph Woodin; | : | |
| Rebecca O'Berry; and Gifford Medical | : | |
| Center, Inc., | : | |
| | : | |
| Counterclaim Defendants | : | |
| And Third-Party Defendants. | : | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | : | |

MEMORANDUM AND ORDER
(Docs. 12, 16)

I.    Introduction

This case arises from a dispute between medical service professionals.

On October 9, 2014, Plaintiffs Catamount Radiology, P.C. ("Catamount") and Scott D.

Smith, M.D. filed a Complaint against Yvette Bailey, M.D., seeking a declaratory judgment and

alleging fraud in the inducement, tortious interference with contract, and breach of good faith and

fair dealing.  (Doc. 1.)

On December 4, 2014, Defendant Bailey filed an Answer containing Counterclaims and Third-Party Claims. (Doc. 5.) Bailey adds Third-Party Defendants Gifford Medical Center, Inc., Joseph Woodin, and Rebecca O'Berry. Bailey's Counterclaims include breach of fiduciary duty against Smith, fraudulent misrepresentation against Smith, breach of Employment Agreement against Smith and Catamount, breach of Shareholders' Agreement against Smith, breach of implied covenant of good faith and fair dealing against Smith and Catamount, promissory estoppel against Smith and Gifford, unjust enrichment/quantum meruit against Smith, Catamount, and Gifford, negligent misrepresentation against Woodin and Gifford, defamation against O'Berry, and defamation against Smith. (Doc. 5.)

Subsequently, Plaintiffs/Counterclaim Defendants Smith and Catamount moved for judgment on the pleadings (Doc. 12), and Third-Party Defendants Woodin, O'Berry, and Gifford moved for judgment on the pleadings (Doc. 16.). Defendant (and Counterclaim Plaintiff) Bailey opposes both motions. (Docs. 13, 18.)

II.   Background

All facts are taken from the Answer and Counterclaims (Doc. 5 (Counterclaims)), which the Court treats as true for the purposes of resolving this motion, and accompanying exhibits.

Dr. Yvette Bailey is a radiologist residing in Connecticut. (Counterclaims ¶ 1.) Dr. Scott Smith is a radiologist residing in Vermont. (Id. ¶ 2.) Before January 1, 2014 Smith was the undisputed sole shareholder of Catamount Radiology, P.C. ("Catamount"), the exclusive radiology services provider for Gifford Medical Center, Inc. ("Gifford"). (Id.)

Until the summer of 2013, Smith had shared ownership in Catamount with another doctor. (Id. ¶ 10.) Following that doctor's departure, Gifford sought a replacement to join Smith at Catamount. (Id. ¶ 11.) In September of 2013, Gifford arranged for Bailey to undergo several

interviews with employees of Gifford and with Smith.  (Id. ¶ 13.)  Bailey informed Smith and Catamount she would have to give up valuable opportunities at her radiology consulting firm and as medical director of an insurance company if she accepted an offer to work at Catamount.  (Id. ¶ 18.)

On September 24, 2013, Smith offered Bailey a position at Catamount.  (Id. ¶ 19.)  Bailey then negotiated the terms of her relationship with Catamount, Smith, and Gifford, speaking primarily with Joseph Woodin, the Gifford CEO.  (Id.)  Bailey alleges during a conversation with Woodin she agreed to a period of three months as an employee of Catamount, rather than an owner, "only if the hospital will agree [Smith] will not have unilateral power to terminate [her]."  (Id. ¶ 21.)  Bailey also alleges Smith warranted he would depart Catamount by the summer of 2014, leaving her as the sole shareholder.  (Id. ¶ 22.)

On November 17, 2013, Catamount, Smith, and Bailey entered into the Shareholders' Agreement (Doc. 5-2), which provided for a three-month "provisional employment period" for Bailey.  (Counterclaims ¶ 24.)  During this three-month period, their relationship would be governed by the Employment Agreement.  (Doc. 5-3.)  After the three-month period had elapsed, the Shareholder's Agreement would apply retroactively to January 1, 2014.  (Doc. 5-2, ¶ 1.6.)

The Shareholders' Agreement provides for 20 shares of stock in Catamount, to be divided between two shareholders.  The parties dispute whether Bailey ever acquired stock in Catamount. The Shareholders' Agreement states in a "whereas" clause that "after a three month provisional employment period for Bailey . . . Smith and Bailey shall each become an owner of fifty-percent of the issued and outstanding shares of capital stock."  (Doc. 5-2.)  Thus, Bailey argues after three months she automatically became a fifty percent shareholder in Catamount.  The Shareholders' Agreement also provides, however, Catamount "shall issue a stock certificate to each Stockholder confirming that said Stockholder owns ten (10) Shares" "[u]pon receipt of payment for shares."  (Id.

3

¶ 1.1)  Bailey never paid for shares.  Consequently Smith and Catamount argue Bailey never became a shareholder in Catamount.

Bailey started work in December of 2013.  Beginning in January of 2014, Smith reduced her wages from $21,000 to $16,800 a month.  (Counterclaims ¶ 31.)  The Employment Agreement provided Catamount pay Bailey $21,000 per month "for the remainder of 2013" and to pay her "for time covered" after January 1, 2014.  (Doc. 5-3, Attachment B.)  The Shareholders' Agreement, effective three months after Bailey began working and applicable retroactively to January 1, provided "Smith and Bailey shall receive equal compensation and benefits."  (Doc. 5-2, ¶ 1.5.)

During Bailey's time working at Catamount, Smith made several disparaging comments about her work.  (Counterclaims ¶ 136.)  On February 11, 2014, Smith informed Gifford employees "he was carrying Dr. Bailey's workload" and complained she could not perform mammograms.  (Id. ¶ 137.)  He did not, however, disclose he was intentionally diverting work from Bailey and he had canceled her training on the Hologic machine, which prevented her from performing mammograms. (Id.)  In late March of 2014, Smith told Gifford employees he distrusted her capabilities as a radiologist because she was incapable of distinguishing shades of gray on a DICOM reader.  (Id. ¶ 140.)  Bailey contends the subtle gray highlight was inadequate to denote a stat case, and in fact the manufacturer changed the color code at her recommendation.  (Id. ¶ 139.)  In March of 2014, Smith told Gifford administrators Bailey "clearly did not know what she was doing" after she asked him how to use an unfamiliar brand of drainage catheter.  (Id. ¶ 141.)  Smith also told Gifford administrators Bailey sought to institute changes at the hospital which would waste money, when in fact the suggested changes would have increased efficiency.  (Id. ¶ 143.)

On March 20, 2014, Bailey completed her initial three-month term of employment with Catamount.  (Id. ¶ 44.)  Bailey did not purchase shares under the Shareholders' Agreement.  In

approximately June of 2014, Smith denied Bailey had ever become a shareholder in Catamount because she had not purchased shares.  (Id. ¶ 55.)  Bailey refused to participate in mediation proposed by Smith's attorney because Smith refused to disclose what the mediation was designed to resolve, and Smith informed Woodin.  (Id. ¶¶ 56-57.)  Woodin responded by terminating Gifford's contract with Catamount.  (Id.)  In a series of emails dated September 12 and 14, 2014 Smith informed Bailey her employment at Catamount was terminated.  (Id. ¶ 67.)

After Bailey's termination, she learned Rebecca O'Berry had told Ms. Kristen Bolio she had been terminated for inability to perform the essential functions of her job and because she was a liar.  (Id. ¶ 70.)  Bailey also alleges O'Berry made these statements to other members of the hospital's staff, and that by spreading these statements O'Berry threatened her professional reputation and impacted her career prospects and earning ability.  (Id. ¶ 71.)

III.   Discussion

A.   Standard of Review

The Court reviews a motion for judgment on the pleadings under the same standard as a motion to dismiss.  See Nashef v. AADCO Med., Inc., 947 F. Supp. 2d 413, 417 (D. Vt. 2013) (citing Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006)).  The Court must "accept as true the complaint's factual allegations and draw all inferences in the plaintiff's favor."  Cleveland, 448 F.3d at 521 (citation omitted).  The counterclaims should not be dismissed on the pleadings unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Id. (citation omitted).  Accordingly, the Court draws all inferences in Counterclaim-Plaintiff Bailey's favor.

B.      Bailey's Relationship with Catamount (Complaint Count I)

Catamount moves for partial judgment on the pleadings as to Count I of their Complaint, which seeks a declaratory judgment as to the legal relations between Catamount and Bailey.[1]  The Declaratory Judgment Act provides:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).  A court must entertain a declaratory judgment action "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."  Ins. Co. of N. Am. v. Vt. Mut. Ins. Co., 835 F. Supp. 176, 181 (D. Vt. 1993) (citing Cont'l Cas. Co. v. Coastal Sav. Bank, 977 F.2d 734, 737 (2d Cir. 1992).  In the case at hand, a declaratory judgment can resolve the dispute over control of Catamount, and also narrow the counterclaims by disposing of several counts Bailey has pled in the alternative.

The parties dispute whether Bailey became a fifty percent shareholder in Catamount.  This depends on interpretation of the Shareholders' Agreement.  Bailey contends the Shareholders' Agreement automatically granted her a fifty percent ownership interest after three months, relying on a precatory clause stating "after a three month provisional employment period for Bailey . . . , Smith and Bailey shall each become an owner of fifty-percent of the issued and outstanding shares

_____

[1] The Complaint seeks a declaratory judgment covering an array of issues, including whether Catamount paid equal compensation to Smith and Bailey.  (Doc. 1, at 14.)  Due to factual disputes, not all of these issues can be resolved at this stage.  Accordingly, Catamount and Smith only move for judgment on the pleadings on the issues of whether Bailey's employment at Catamount was terminated and whether Bailey became an owner of Catamount.

of capital stock." (Doc. 5-2.)  Smith argues the contract did not grant Bailey a stake in Catamount automatically, but instead gave her an opportunity to purchase shares, citing a purchase price of $16,000 for ten shares (Id. ¶¶ 1.1-1.2) and language making the purchase of shares optional: "In the event either Stockholder wishes to purchase Shares in the Company and meets the conditions above, then the Company shall sell and issue to said Stockholder such shares as may have been approved by the Stockholders of the Company." (Id. ¶ 4.2.)  The Shareholders' Agreement also sets out conditions that must be met for stock to be transferred, including notice to Gifford or Catamount (Id. ¶ 6.5) and approval by Gifford or Catamount (Id. ¶ 4.1).

Bailey argues the Shareholders' Agreement is ambiguous, and that therefore the Court may resort to extrinsic evidence to interpret the terms.  See Isbrandtsen v. N. Branch Corp., 150 Vt. 575, 577, 556 A.2d 81, 83 (1988) (the parol evidence rule generally bars evidence outside the plain text of an agreement, but if a contract is ambiguous "extrinsic evidence may be used to aid in [its] construction").  In Vermont, "when inquiring into the existence of ambiguity," a court "consider[s] the circumstances surrounding the making of the agreement" and may find ambiguity "where a writing in and of itself supports a different interpretation from that which appears when it is read in light of the surrounding circumstances."  Id. at 579.

In this case, the Shareholders' Agreement is unambiguous as to how Bailey might have become a shareholder.[2]  "[I]t is a basic tenet of contract interpretation that specific terms are given greater weight than are general terms."  Foti Fuels, Inc. v. Kurrle Corp., 195 Vt. 524, 539, 90 A.3d 885, 895 (2013).  Under this rule, general precatory clauses in a contract must give way to specific

---

[2] Bailey argues the Shareholders' Agreement is ambiguous because it provides Bailey be paid based on Catamount's financial performance, but does not provide a method to assess Catamount's financial performance.  (Doc. 13, at 13.)  Even if this provision were ambiguous, that does not render ambiguous the portions of the Shareholders' Agreement setting out the procedures by which Bailey might become a shareholder.

terms.  Thus, the precatory clause Bailey relies upon is best read as expressing the intent of the parties that Bailey become a shareholder by following the procedures set out in the remainder of the contract, not as automatically issuing her shares after three months.  Bailey does not allege Smith or Catamount made any complicating representations when the contract was made -- the Counterclaims only allege Gifford CEO Woodin negotiated the contracts -- and therefore the circumstances surrounding the drafting of the contract do not create ambiguity concerning Bailey's agreement with Smith.  Furthermore, if Bailey's interpretation of the contract is correct and the passage of time alone was sufficient to grant her a fifty percent stake in Catamount, then much of the remainder of the contract would be superfluous.  See Isbrandtsen, 150 Vt. at 580-81 ("If a contract, though inartfully worded or clumsily arranged, fairly admits of but one interpretation, it may not be said to be ambiguous or fatally unclear.") (citation omitted).  Provisions setting out the price of stock and the procedure for purchasing stock would serve no purpose if the contract automatically granted Bailey equity after the mere passage of time.

Bailey ultimately did not purchase shares under ¶ 4.2.  See Doc. 5 (Answer of Bailey), at ¶ 21 (admitting Bailey was never issued Catamount stock certificates).  Bailey alleges she "requested that Dr. Smith issue her stock certificates, which Dr. Smith wrongly refused to do." (Answer of Bailey, ¶ 21.)  Bailey does not, however, allege that she ever tendered $16,000 for the purchase of shares under ¶ 1.2, that she gave notice to Smith or Catamount consistent with the requirements of ¶ 6.5, or that she or that Catamount ever issued shares under ¶ 4.2.[3]  Accordingly, she never became a

---

[3] Bailey argues she had a right of setoff and was therefore not required to purchase shares, she gave Smith actual notice so written notice was not required, and the issuance of stock certificates by Catamount was an irrelevant formality.  Because the Court finds Bailey had no right of setoff -- the Shareholders' Agreement required her to tender money to purchase shares in Catamount -- it need not reach the questions of whether Bailey satisfied the notice provision or whether the issuance of stock certificates was necessary.  A setoff "is a right given or recognized by the commercial law of each of the states." Studley v. Boylston Nat'l Bank of Boston, 229 U.S. 523, 528 (1913).  "In

shareholder in Catamount and remained an employee.  Cf. Litchhult v. USTRIVE2, Inc., No. 10-civ-3311, 2013 WL 3491076, at *19 (E.D.N.Y. July 10, 2013) (granting summary judgment to defendant employer on plaintiff employee's breach of contract claim seeking stock options when plaintiff failed to exercise stock options).

Bailey never became a shareholder and the Shareholders' Agreement and was therefore an at-will employee subject to termination without cause.  See Mullaney v. C.H. Goss Co., 97 Vt. 82, 122 A. 430, 432 (1923) (an employer may terminate an employment contract for an indefinite time period at any time).  Accordingly, based on the allegations in Bailey's Answer and Counterclaims, Catamount terminated her employment.

Accordingly, the Court issues a declaratory judgment that: (1) Bailey did not become a shareholder in Catamount because she never purchased shares as required by the Shareholders' Agreement; and (2) Bailey's employment was terminated effective September 18, 2014.

---

Vermont the right of setoff derives from the contractual relationship between the depositor and the bank."  O'Donnell v. Bank of Vermont, 166 Vt. 221, 225, 692 A.2d 1212, 1214 (1997).  Bailey does not allege she had a contractual relationship with Catamount or Smith analogous to the relationship between a bank and a depositor -- neither Catamount nor Smith gave her legal title to the money she seeks to treat as a setoff.  See id. ("As titleholder, the bank has the right to apply the depositor's money to extinguish a matured preexisting debt.").  Furthermore, the plain text of the Shareholders' Agreement, which enumerates conditions Bailey needed to meet to become a shareholder, supersedes any common law right of setoff.  See Refinemet Int'l Co. v. Eastbourne N.V., 25 F.3d 105, 108 (2d Cir. 1994) (holding appellant may not exercise a right of setoff to satisfy a contract when "[t]he terms of the Agreement make any [state law right of setoff], if it exists, inapplicable to the case at bar").  Bailey alternatively argues she was entitled to make payment within a reasonable time after informing Smith and Catamount she intended to become a shareholder.  See Hart v. Hart, 35 Va. App. 221, 237, 544 S.E.2d 366, 374 (2001) ("where an agreement granting an option to purchase a particular tract of land requires that it be exercised on or prior to a designated date, but is silent as to the time at which payment of the stipulated purchase price is to be made, the option may be exercised by the optionee without making or tendering payment at the time of, or coincident with, such exercise.").  The Shareholders' Agreement, however, was not silent as to the time at which payment was required, as it states Catamount "shall issue a stock certificate" "[u]pon receipt of payment."  Doc. 5-2, at ¶ 1.1.

C.     Smith and Catamount's Motion for Judgment on the Pleadings (Doc. 12)

      1.     Breach of Fiduciary Duty as to Dr. Scott Smith (Counterclaims Count I)

Whether Smith owed a fiduciary duty to Bailey depends on whether Bailey was a shareholder in Catamount.  See P.F. Jurgs & Co. v. O'Brien, 160 Vt. 294, 304, 629 A.2d 325, 331 (1993) ("[S]hareholders in a closely held corporation owe one another a fiduciary duty of good faith and loyalty.").  If Bailey was a mere employee, Smith owed her no fiduciary duty.  Because Bailey never bought into Catamount under ¶ 4.2 of the Shareholders' Agreement and never became a shareholder, Smith owed her no fiduciary duty.  Accordingly, her claim for breach of fiduciary duty is dismissed.

      2.     Fraudulent Misrepresentation as to Dr. Scott Smith (Counterclaims Count II)

Bailey alleges Smith misrepresented his intention to make her a shareholder (Counterclaims ¶ 90), his intention to pay her salary (Id. ¶¶ 88-90), and his intention to leave Catamount in the summer of 2014.  (Id. ¶¶ 86-87.)  Smith argues Bailey has not adequately pleaded fraud under Fed. R. Civ. P. 9(b) and Bailey's breach of contract claims preclude fraud claims.  (Doc. 12, at 8-10.)

"Fraudulent misrepresentation involves an intentional misrepresentation of existing fact, affecting the essence of the transaction, so long as the misrepresentation was false when made and known to be false by the maker, was not open to the defrauded party's knowledge, and was relied on by the defrauded party to its damage."  Howard Opera House Assocs. v. Urban Outfitters, Inc., 166 F. Supp. 2d 917, 926 (D. Vt. 2001), aff'd 322 F.3d 125 (2d Cir. 2003) (quotations omitted).  Fed. R. Civ. P. 9(b) requires a plaintiff to plead fraud with particularity by (1) specifying the statements the plaintiff contends were fraudulent, (2) identifying the speaker, (3) stating where and when the statements were made, and (4) explaining why the statements were fraudulent.  See Nakahata v. New York Presbyterian Healthcare Sys., Inc., 723 F.3d 192, 197 (2d Cir. 2013).

Bailey argues Smith misrepresented his intention to make her a shareholder.  (Counterclaims ¶¶ 84-85.)  Smith's former partner departed Catamount in the summer of 2013 (Id. ¶ 10), and Gifford demanded he replace him to ensure Catamount could meet the hospital's radiology needs (Id. ¶¶ 10-11).  Bailey reasons Smith only hired her to placate Gifford.  Bailey also argues Smith misrepresented his intention to pay her.  (Id. ¶¶ 88-90.)

Smith argues Bailey's fraudulent misrepresentation claim must be dismissed because it is duplicative of her breach of Shareholders' Agreement claim.  Applying New York law, the Second Circuit has found where "a fraud claim arises out of the same facts as Plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and the plaintiff's sole remedy is for breach of contract." Telecom Int'l Am., Ltd. v. AT&T Corp., 280 F.3d 175, 196 (2d Cir. 2001).  Similarly, in Vermont, "false representations or broken promises referring merely to the future do not afford the basis of actionable fraud." Gramatan Nat'l Bank & Trust Co. of Bronxville v. Beecher, 121 Vt. 39, 46, 146 A.2d 246, 251 (1958).  Smith's relationship with Bailey is governed by the Shareholders' Agreement, which set out terms under which Bailey could become his partner and be paid.  The Shareholders' Agreement is silent on Smith's departure from Catamount.  Thus, the Court would be required to dismiss a fraudulent misrepresentation claim that depended solely on Smith's promise to abide by the Shareholders' Agreement.

Bailey instead argues she has alleged Smith engaged in a fraudulent scheme by which he hired her to appease Gifford with the intent of firing her.  Although "a promise, standing alone, does not afford the basis of actionable fraud, it is not improper to consider broken promises where there was a general scheme to defraud of which the promises were steps in a series of actions constituting the scheme." Id.; see also Harponola Co. v. Wilson, 96 Vt. 427, 435, 120 A. 895, 898

11

(1923) (a plaintiff may state a claim for fraud based on broken promises when "[t]he promises were steps in a series of actions constituting the scheme, and were a most apt and effectual means of accomplishing the fraud").  Bailey's Counterclaims tell a story in which Smith wanted to continue to work alone at Catamount but caved to Gifford's pressure to hire Bailey.  Bailey contends Smith devised a plan in which he placated Gifford by hiring Bailey and then forced her out.  Initially, Smith induced Bailey to sign the Shareholders' Agreement and Employment Agreement by promising he would make her a shareholder (Counterclaims ¶ 90), pay her a fair salary (Id. ¶ 88-89), and leave Catamount in the summer of 2014 (Id. ¶ 86-87).  Then, Smith forced Bailey out of Catamount so that he could continue running the business alone.  Bailey provides support for this theory by alleging Smith began undermining her with Gifford almost immediately after signing the contracts by expressing concerns with her approach for breast imaging.  (Id. ¶ 25.)  She also alleges Smith "stalked the halls at Gifford, trying to discover whether there were any complaints about Dr. Bailey's performance."  (Id. ¶ 33.)  Smith canceled Bailey's training on the Hologic machine (Id. ¶ 41) and diverted lucrative business to himself (Id. ¶¶ 46-47).  Ultimately, Smith took the position Bailey never became a shareholder (Id. ¶ 55) and fired Bailey (Id. ¶ 67).  Taken together, these allegations, if proved, could establish Smith misrepresented his intentions in hiring Bailey as part of a fraudulent scheme designed to placate Gifford.[4]  The allegations are reasonably particular and satisfy Fed. R. Civ. P. 9(b).

---

[4] In their Reply, Catamount and Smith argue the "fraudulent scheme" doctrine only applies where a defendant is "engaged in other fraudulent transactions of like kind."  Gramatan, 121 Vt. at 46.  Though evidence of other fraudulent transactions was found admissible in Gramatan, the existence of those transactions was not necessary to show a fraudulent scheme.  See Harponola, 120 A. at 898 (a fraudulent scheme could be found where a consignment salesman made a series of false promises to a manufacturer to induce the manufacturer to sign an agreement different than bargained for).

Accordingly, the Motion for Judgment on the Pleadings is denied as to Count II, Bailey's claim for fraudulent inducement.

>      3.      Breach of Shareholders' Agreement and Employment Agreement as to Dr. Scott Smith and Catamount (Counterclaims Counts III and IV)

Bailey asserts Smith and Catamount breached the Employment Agreement "by refusing to compensate her at agreed-upon levels, or to provide her with employment benefits to which she was entitled, including the benefits of the contract's termination clause." (Counterclaims, ¶ 95.)  There is no dispute Catamount paid Bailey at a rate of $21,000 a month for the time she worked during December 2013 in accord with the Employment Agreement.  See Counterclaims ¶ 31, Doc. 10 ¶ 31. After March 17, 2014, The Shareholders' Agreement retroactively covered Bailey's employment for all of 2014, and therefore Bailey has no claim for breach of the Employment Agreement in 2014. See Doc. 5-2, ¶ 1.3 ("Three (3) months after Bailey obtains her Vermont license to practice as a physician and begins to perform professional services . . . [the] Employment Agreement shall be null and void, and shall be replaced by the instant agreement.").  Accordingly, Count III is dismissed.

Bailey also claims Smith "breached the Shareholders' Agreement by failing to accord Dr. Bailey the rights to which she was entitled, including but not limited to the right to share profits equally, and the right to participate equally in the control of the corporation." (Counterclaims ¶ 99.) As discussed above, Bailey was not entitled to share control of Catamount under the Shareholders' Agreement because she never fulfilled the requirements necessary to become a shareholder. Similarly, she was not entitled to share in profits as a shareholder.

Although Bailey did not become a shareholder, under its express terms the Shareholders' Agreement applied throughout Bailey's employment in 2014.  The Shareholders' Agreement provides "Smith and Bailey shall receive equal compensation and benefits, etc., as determined by

such two Stockholders in conjunction with the Company."[5]  (Doc. 5-2, ¶ 1.5.)  Smith argues Bailey

fails to state a claim for equal compensation in Count IV because she only specifically alleges rights

to an equal share of profits and equal control, and requests the Court require Bailey to make a more

specific pleading.  See Doc. 17, at 7 n.7.  The Court, however, finds Bailey states a claim for breach

of the "equal compensation" provision of the Shareholders' Agreement, ¶ 1.5.  Because Bailey never

became a shareholder, her claim for breach of her "right to share profits equally," viewed in tandem

with her claim for a general breach of "the rights to which she was entitled" by the Shareholders'

Agreement, is best read as a claim for equal compensation.  Compensation can include profit-

sharing, and an employee need not be a principal to receive payment out of the profits of a

corporation.  See Black's Law Dictionary 322 (9th ed. 2009) (compensation "includes . . . profit-

sharing . . ."); see also Sheldon v. Little, 111 Vt. 301, 306, 15 A.2d 574, 576 (1940) (concluding it was

the intent of the parties that a non-partner receive "a portion of the profits not as profits, but as

compensation for his services").

Bailey alleges she was not compensated equally to Smith.  She claims Smith failed to

reimburse Bailey for a continuing medical education course in mammography and "for licensing

fees, health insurance, or medical malpractice insurance," (Counterclaims, ¶ 30), and when Gifford

---

[5] Whereas the provisions of the Shareholders' Agreement concerning issuance of stock shares are clear, the provision addressing compensation under the Shareholders' Agreement is ambiguous.  First, the provision does not set out the full scope of compensation, but provides for "equal compensation and benefits" followed by the vague catch-all "etc."  (Id.)  Second, the provision contemplates compensation decisions made by "such two Stockholders," not a single stockholder managing an employee.  (Id.)  On its face the Shareholders' Agreement does not contemplate Bailey carrying on as an employee after declining to buy shares in Catamount.  To resolve this ambiguity, "the court may rely on subordinate rules of construction in order to interpret the meaning of the disputed terms."  See Isbrandtsen, 160 Vt. at 579.  This includes "consider[ing] evidence as to the circumstances under which the conveyance was made."  Id. at 580.  Accordingly, at summary judgment the parties may present extrinsic evidence to give meaning to the "equal compensation and benefits, etc." provision.

provided money to Catamount to offset these costs, Smith kept that money.  (Id. ¶ 37.)  Bailey also alleges Smith paid himself "more than sixty percent of the company's projected profits" after diverting "more than sixty percent of the company's business to himself."  (Id. at ¶ 46.) Additionally, Bailey asserts Smith paid himself "an additional one month's salary" because he performed mammograms before Bailey's recertification.  (Id. at ¶ 47.)  Smith argues the Independent Accountant's Report justifies the compensation Bailey received, see Doc. 12, at 14 n.4, but Bailey disputes -- and is at this stage entitled to dispute -- the factual accuracy of that Report. (Answer of Bailey, ¶ 30.)  If Bailey ultimately substantiates the facts as pleaded, the Court could conclude the Shareholders' Agreement required Smith to pay Bailey wages and benefits equal to Smith's wages and benefits and that Smith did not do so.

Whether Smith may be liable in his individual capacity for breach of the Shareholders' Agreement depends on whether Catamount was his corporate alter ego.  See Agway Inc. v. Brooks, 173 Vt. 259, 262, 790 A.2d 438, 441 (2001).  The Court may pierce the corporate veil only where "necessary to prevent fraud or injustice."  In re Vermont Toy Works, Inc., 135 B.R. 762, 770 (D. Vt. 1991).  Vermont courts are generally reluctant to pierce the corporate veil.  See id. (citing Jack C. Keir, Inc. v. Robinson & Keir P'ship, 151 Vt. 358, 360, 560 A.2d 957, 959 (1989)).  Bailey alleges Catamount was Smith's alter ego because he drained capital from the corporation for personal use (Counterclaims ¶ 72), he ignored corporate formalities (Id. ¶ 73), he perpetrated a fraud on Bailey through the corporation by unilaterally reducing her pay and funneling corporate money intended for her training to himself for personal use (Id. ¶ 74).  "Undercapitalization alone is not a sufficient ground for disregarding the corporate entity."  In re Vermont Toy Works, Inc., 135 B.R. at 771. Furthermore, the sole shareholder of a corporation may properly act as sole director, and "certain corporate formalities are nonsensical when applied to small privately-held corporations and should

15

be given little, if any, weight in a veil piercing action." Id. at 770.  When the Court may pierce the corporate veil ultimately depends on whether Bailey has adequately alleged Smith perpetrated a fraud.  Because the Complaint states a claim for fraudulent inducement, Bailey may pursue her claim against Smith in his individual capacity.

Accordingly, the Court denies the Motion for Judgment on the Pleadings as to Count IV against Smith.

4.    Breach of Implied Covenant of Good Faith and Fair Dealing as to Dr. Scott Smith and Catamount (Counterclaims Count V)

"Vermont law does not recognize a separate cause of action for violation of the covenant of good faith and fair dealing when a plaintiff also pleads a breach of contract claim based on the same conduct." Mount Snow Ltd. v. ALLI, the Alliance of Action Sports, No. 1:12-cv-22-jgm, 2013 WL 4498816, at *7 (D. Vt. Aug. 21, 2013) (citing Ferrisburgh Realty Investors v. Schumacher, 187 Vt. 309, 322, 992 A.2d 1042, 1052 (2010)).  Bailey argues her Count V claim for breach of implied covenant of good faith and fair dealing "fall[s] outside the strict scope of the parties' Agreements." (Doc. 13, at 15.)  Specifically, Bailey alleged Smith (1) canceled her training on the Hologic machine and paid himself more when only he could use it; (2) intentionally diverted work toward himself and consequently paid himself more; and (3) kept money Gifford paid out to defray Bailey's expenses for himself.  (Id. at 15-16.)  Smith and Catamount argue these issues are within the scope of the Shareholders' Agreement, which provides Bailey and Smith receive "equal compensation and benefits."  (Doc. 5-2, ¶ 1.5.)  As the Vermont Supreme Court has explained, "breaches of express contractual terms sound in contract," whereas breaches of implied contractual terms are addressed through a claim for breach of an implied covenant of good faith and fair dealing.  Monahan v. GMAC Mortg. Corp., 179 Vt. 167, 187 n.5, 893 A.2d 298, 316 n.5 (2005).

16

At bottom, Bailey's claims for breach of the implied covenant of good faith and fair dealing are claims she was not properly compensated.  Bailey's compensation is expressly covered by contract in the Employment Agreement and the Shareholders' Agreement.  Accordingly, Count V is dismissed.

     5.     <u>Promissory Estoppel as to Dr. Scott Smith</u> (Counterclaims Count VI)

To state a claim for promissory estoppel, "the plaintiff must show that (1) defendant made a promise to the plaintiff; (2) that the defendant should have reasonably expected that the promise would induce action or inaction by the plaintiff; (3) that the promise actually did induce action or inaction; and (4) that justice requires enforcement of the promise."  <u>Cressy v. Proctor</u>, No. 2:12-cv-00262-wks, 2013 WL 1431052, at *3 (D. Vt. Apr. 9, 2013) (citing <u>Tour Costa Rica v. Country Walkers Inc.</u>, 171 Vt. 116, 120, 758 A.2d 795, 800 (2000)).

Smith argues Bailey's promissory estoppel claim must be dismissed because the contracts, the Shareholders' Agreement and the Employment Agreement, control.  <u>See</u> Doc. 12, at 16.  The Counterclaims, however, alleges Smith promised to leave Catamount and hand over the corporation to Bailey well after the contracts were signed.  (Counterclaims, at ¶ 36.)  In reliance on this promise, Bailey remained at Catamount when she would have otherwise left.  (<u>Id.</u> ¶ 111.)  This promise was independent of the initial contracts.  Accordingly, Bailey states a claim for promissory estoppel.

The Court denies Smith's Motion for Judgment on the Pleadings as to Count VI.

     6.     <u>Unjust Enrichment/Quantum Meruit as to Dr. Scott Smith and Catamount</u> (Counterclaims Count VII)

"Under a quasi-contract theory of unjust enrichment, the law implies a promise to pay when a party receives a benefit and retention of the benefit would be inequitable."  <u>Brookside Memorials, Inc. v. Barre City</u>, 167 Vt. 558, 559, 702 A.2d 47, 49 (1997).  Bailey argues for two types of quasi-contract claims.

17

First, Bailey pleads her quasi-contract claims in the alternative to her breach of contract claims.  Because the Court finds the Shareholders' Agreement enforceable, however, Bailey has no quasi-contract claim for compensation.  See DJ Painting, Inc. v. Baraw Enters., Inc., 172 Vt. 239, 245, 776 A.2d 413, 419 (2001) ("[I]t can hardly be equitable to impose a contract on the parties that completely undermines the contractual relationships that the parties themselves have created.").

Second, Bailey argues in briefing she seeks to recover for costs not covered by the Shareholders' Agreement, including out-of-pocket expenses for her mammography certification. See Doc. 13, at 18.  Bailey relies on the decisions applying Texas law, see Bluelinx Corp. v. Tex. Constr. Sys., Inc., 363 S.W.3d 623, 627 (Tex. App. 2011) ("[t]he existence of an express contract does not preclude quantum meruit recovery for services or materials that are not covered by the contract."), and Iowa law, see Phillips Kiln Servs., Ltd. v. Int'l Paper Co., No. 02-cv-4005-mwb, 2002 WL 1712870, at *4 (N.D. Iowa June 3, 2002) ("there may be an implied contract on a point not covered by an express one").  As pleaded, this case is similar.  Bailey contracted for wages and benefits, but she did not enter any express contract for reimbursement of licensing fees, health insurance, medical malpractice insurance, or a mammography recertification course.  (Counterclaims ¶ 30.)  Bailey alleges reimbursement of these costs is standard industry practice.  (Id.)  Of course, to the extent licensing fees, health insurance, medical malpractice insurance, and a mammography recertification course qualify as "benefits" under the Shareholders' Agreement, that contract provides Bailey's exclusive remedy.  But to the extent any of these out-of-pocket expenses do not qualify as benefits, Bailey may ultimately prove Catamount inequitably received the benefit of these costs.

Accordingly, the Court denies Catamount and Smith's Motion for Judgment on the Pleadings as to Count VII.

7.      Defamation as to Smith (Counterclaims Count X)

In Vermont, the elements of defamation are:

> (1) a false and defamatory statement concerning another; (2) some
> negligence, or greater fault, in publishing the statement; (3)
> publication to at least one third person; (4) lack of privilege in the
> publication; (5) special damages, unless actionable per se; and (6)
> some actual harm so as to warrant compensatory damages.

Ryan v. Herald Ass'n, Inc., 152 Vt. 275, 277, 566 A.2d 1316, 1317 (1989) (citing Lent v. Huntoon,

143 Vt. 539, 546-47, 470 A.2d 1162, 1168 (1983)).

Bailey alleges Smith made a handful of defamatory statements.  First, she alleges "Smith

stated that he was carrying [her] workload" and he "complained that she remained incapable of

performing mammograms."  (Counterclaims ¶ 137.)  Second, she alleges Smith "repeatedly stated to

staff persons and administrators . . . he distrusted her capabilities as a radiologist if she was incapable

of distinguishing between shades of grey [sic]" on the DICOM reader.  (Id. ¶ 140.)  Third, Smith

stated to hospital administrators she "had performed a procedure on a patient [with a drainage

catheter] and 'clearly did not know what she was doing.'"  (Id. ¶ 142.)  Fourth, Smith repeatedly told

hospital administrators she was wasting the hospital's money by attempting to impose changes.  (Id.

¶ 143.)  Smith argues each of these statements was true under the terms of the pleadings or a non-

actionable matter of opinion, and that all of the statements are privileged.  (Doc. 12, at 17.)

First, as pled in the Counterclaims, certain of the allegedly defamatory statements are true

and not actionable.  Smith's assertion he was carrying Bailey's workload and that she could not

perform mammograms (Id. ¶ 137) was true, as she states he "was intentionally taking on more

work" by "diverting work away" from her and she was waiting for training on the Hologic machine

to perform mammograms (Id.).  In her Opposition, Bailey maintains the statement was false.  (Doc.

13, at 18.)  Her very Counterclaims, however, contradict this assertion.   See Milo v. Univ. of

Vermont, No. 2:12-cv-124, 2013 WL 4647782, at *11 (D. Vt. Aug. 29, 2013) (when "[t]he truth of [a] fact is undisputed . . . it is therefore not defamatory").

Second, certain of the allegedly defamatory statements are opinions. "Whether a statement is opinion or fact is a question of law for the court." Knelman v. Middlebury Coll., 898 F. Supp. 2d 697, 720 (D. Vt. 2012), aff'd, 570 F. App'x 66 (2d Cir. 2014). Although Vermont has not expressly adopted factors for distinguishing opinions from facts, this Court has considered the following factors:

> (1) An assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous; (2) a determination of whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might signal to readers or listeners that what is being read or heard is likely to be opinion, not fact.

Id. at 721 (citing Kirch v. Liberty Media Corp., 449 F.3d 388, 403 (2d Cir. 2006)) (quotations omitted). Smith's statement that Bailey's proposed changes would waste Gifford's money fall into the category of opinions and cannot state a claim. Smith's view that changes in protocols or equipment were not necessary are statements of his opinion based on his experience in practice.

Although a pure opinion cannot give rise to a defamation claim, a "mixed opinion" can. Knelman, 898 F. Supp. 2d at 721. "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature it [sic] actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." Id. at 722 (citing Restatement (Second) of Torts § 566 (1977)). Thus, a statement "couched as an opinion regarding what a reasonable person would conclude" may be defamatory if it "clearly suggests a repository of facts, based upon information [the speaker] had gathered," supporting the conclusion. Wright v.

Yacovone, No. 5:12-cv-27, 2014 WL 1165834, at *8 (D. Vt. Mar. 21, 2014).  "It is the function of

the court to determine whether an expression of opinion is capable of bearing defamatory meaning

because it may reasonably be understood to imply the assertion of undisclosed facts that justify the

expressed opinion about the plaintiff."  Knelman, 898 F. Supp. 2d at 723 (citation and quotations

omitted).  Smith's alleged statements that he distrusted Bailey's abilities as a radiologist and that she

clearly did not know what she was doing suffice to state a claim for defamation, as these statements

could have implied to the listener that Smith knew of Bailey's incompetence when in fact Bailey was

perfectly competent.  Bailey explains in her pleadings that, in fact, the underlying facts do not

indicate Bailey was incompetent -- rather, she was poorly trained on the DICOM reader

(Counterclaims ¶ 138) and merely unfamiliar with a "cheap brand of catheter" (Id. ¶ 141).

Accordingly, the Court will not dismiss claims based on those statements at this stage.

Third, Smith argues the statements are privileged.  A privilege to publish allegedly

defamatory information arises when publication is necessary to protect a legitimate interest of the

publisher or the recipient, or a shared interest of both.  See Lent, 143 Vt. at 548-49 (recognizing a

privilege to "protect . . . legitimate business interests").  A showing of malice, however, can

overcome the privilege.  See id.  The privilege may ultimately exist, but the Court declines to dismiss

at this stage potentially valid claims that depend on Smith's state of mind.  See Prop. & Cas. Ins. Co.

of Hartford v. Davenport, 907 F. Supp. 2d 561, 567 (D. Vt. 2012) ("Whether a person is capable of

acting with a particular mental state is typically a question of fact for the jury.").

Under the facts alleged, Bailey states a claim for defamation based on Smith's statements

that he distrusted Bailey's abilities as a radiologist and that Bailey "did not know what she was

doing" with a catheter.  (Counterclaims ¶¶ 140, 142.)  Accordingly, the Motion for Judgment on the

Pleadings is denied as to Count X.

D.      Woodin, O'Berry, and Gifford's Motion for Judgment on the Pleadings (Doc. 16)

1.      Promissory Estoppel as to Gifford (Counterclaims Count VI)

In order to state a claim for promissory estoppel a plaintiff must allege a promise that is "more than a mere expression of intention, hope, desire, or opinion, which shows no real commitment." Nelson v. Town of St. Johnsbury, 2015 VT 5, ¶ 56, _ A.3d _ (2015) (quoting Escribano v. Greater Hartford Acad. of Arts, 449 F. App'x 39, 43 (2d Cir. 2011). In Nelson, the Vermont Supreme Court affirmed dismissal of a promissory estoppel claim on summary judgment when a defendant attorney had given legal advice concerning the circumstances under which plaintiff's employment could be terminated. See id. at ¶ 57. A promissory estoppel claim only exists if a defendant manifested an intent to "act in a specified way," and must fail where a defendant merely provided an opinion. Id.

According to the pleadings, Gifford's CEO, Woodin, told Bailey she had a future at Gifford and stated "it will all work out, your position is safe here, just go along with the process." (Counterclaims ¶ 109.) Whether Bailey's claim for promissory estoppel against Gifford survives depends on whether this was a promise on which Gifford could act or a mere opinion. Bailey argues Gifford had sufficient control over Catamount to guarantee Bailey's position and therefore "Bailey had the right to expect that Gifford would make good on this promise, because Gifford could." (Doc. 18, at 7.) As Gifford argues, however, it did not have control over Catamount as a matter of contract, as the Radiology Services Agreement between Gifford and Catamount states Gifford "shall not exercise supervision or control of the Physicians." (Doc. 5-1, at ¶ 10.) Bailey could not have reasonably interpreted Woodin's assurances to be promises because Woodin did not have the power to make Catamount act in the specified way.

22

Similarly, the cases Bailey cites for the proposition an opinion can support a promissory estoppel claim are unhelpful.  First, QA3 Fin. Corp. v. Fin. Network Inv. Corp., No. 8:12-cv-5, 2013 WL 1148765 (D. Neb. Mar. 19, 2013), addresses only "promissory fraud," as the court had previously dismissed promissory estoppel claims.  See id. at *11.  Second, Ryann Spencer Grp., Inc. v. Assurance Co. of Am., 275 S.W.3d 284 (Mo. Ct. App. 2008), addresses a negligent misrepresentation claim and concludes "[t]he representation is not actionable if it regards the future actions of an independent third party."  Id. at 291.  In the present case, as a matter of contract Gifford does not control Catamount, an independent entity.

Accordingly, Count VI is dismissed.

2.    Unjust Enrichment/Quantum Meruit as to Gifford (Counterclaims Count VII)

"Claims for quasi-contract are based on an implied promise to pay when a party receives a benefit and the retention of the benefit would be inequitable."  DJ Painting, Inc. v. Baraw Enters., Inc., 172 Vt. 239, 242, 776 A.2d 413, 417 (2001).  To state a claim for quantum meruit or unjust enrichment, a plaintiff must allege facts showing a benefit was conferred on defendant, defendant accepted the benefit, and it would be inequitable for defendant to not compensate plaintiff.  See id.

Bailey alleges she conferred a benefit on Gifford by providing the hospital with radiology services but was not compensated for those services.  (Counterclaims ¶ 114.)  In response, Gifford argues a quasi-contract claim does not exist when a contract is present, even if that contract is with a third party.  "Although the existence of [a contract with a third party] does not necessarily preclude a remedy against [Gifford], the terms of the contract and the remedies exercised under it become highly relevant in determining whether denying further payment to [Bailey] is unjust, such that [the Court] should imply a contract where there is none."  DJ Painting, 172 Vt. at 243.  Bailey performed work for Catamount, to be paid by Catamount.  Catamount received payment from Gifford for

Bailey's work.  The Radiology Services Agreement between Catamount and Gifford establishes

"[Catamount] shall be solely responsible for the compensation and benefits of the Physicians."  <u>See</u>

Doc. 5-1, ¶ 10.  Bailey's remedy for unpaid wages lies with Catamount, not with Gifford.

      Accordingly, Count VII is dismissed as to Gifford.

      3.    <u>Negligent Misrepresentation as to Woodin and Gifford</u> (Counterclaims
Count VIII)

      Vermont courts apply the standard for negligent misrepresentation set out in the

Restatement (Second) of Torts § 552:

> One who, in the course of his business, profession or employment,
> or in any other transaction in which he has a pecuniary interest,
> supplies false information for the guidance of others in their business
> transactions, is subject to liability for pecuniary loss caused to them
> by their justifiable reliance upon the information, if he fails to
> exercise reasonable care or competence in obtaining or
> communicating the information.

<u>Howard v. Usiak</u>, 172 Vt. 227, 230-31, 775 A.2d 909, 913 (2001) (quoting Restatement (Second) of

Torts § 552).  Accordingly, statements that contain no "false information" cannot form the basis for

a negligent misrepresentation claim.  <u>See id.</u>, 172 Vt. at 230-31.

      Bailey's negligent misrepresentation claim, Count VIII, as to Woodin and Gifford is based

on the same statement as her promissory estoppel claim, Count VI, Gifford CEO Woodin's

assurance "everything was going to work out."  This type of assurance cannot form the basis for a

negligent misrepresentation claim because a plaintiff cannot "turn[] a promise to perform into a

statement of fact so that failure to perform automatically shows a misrepresentation of intention to

perform."  <u>Howard</u>, 172 Vt. at 231-32.  In other words, an assurance "everything was going to work

out" does not qualify as "information" susceptible to falsity and cannot form the basis of a negligent

misrepresentation claim.  <u>See id.</u> at 232.  Even had Woodin made a false statement, Bailey entered

into a contract, and it would be unreasonable to rely on a third party's warranty that it would "work out."

Accordingly, Count VIII is dismissed.

    4.    <u>Defamation as to O'Berry</u> (Counterclaims Count IX)

Bailey alleges "O'Berry made statements to persons within the medical community denigrating Dr. Bailey's professional competence" (Counterclaims ¶ 129), these statements were false (<u>Id.</u> ¶ 130), and publication of these statements "would be expected not only to threaten Dr. Bailey's professional reputation, but also to negatively impact her career prospects and earning ability" (<u>Id.</u> ¶ 71). Specifically, Bailey alleges O'Berry told others "Dr. Bailey had been terminated for inability to perform the essential functions of her job, and because she was a liar." (<u>Id.</u> ¶ 70.)

O'Berry argues this claim cannot survive because Bailey has failed to allege "actual harm." <u>See</u> <u>Lent</u>, 143 Vt. at 549 (stating "liability for defamation must logically be based on some showing of harm to the plaintiff"). Although a plaintiff must ultimately prove actual loss to recover damages, at the pleading stage a plaintiff may "rely on the rule permitting the [defamation] action to go forward without specially pleading and proving pecuniary loss." <u>Ryan</u>, 152 Vt. at 282-83 152 Vt. 275, 282-83, 566 A.2d 1316, 1320 (1989). O'Berry also argues the pleadings do not provide sufficient information to give notice of the statements alleged to have defamed Bailey. The Court finds the Counterclaims sufficiently identify the approximate content of the statements, who made the statements, who heard the statements, and the timing of the statements. <u>See</u> <u>D'Annunzio v. Ayken, Inc.</u>, 876 F. Supp. 2d 211, 216 (E.D.N.Y. 2012) ("A plaintiff need not plead a defamatory statement <u>in haec verba</u>, but the pleadings must be sufficient to afford defendant sufficient notice of the communications complained of to enable him to defend himself.") (citation and quotations omitted).

Bailey alleges O'Berry told others she was incompetent and a liar after her termination and that she suffered harm as a result.  Because this states a claim sufficient to survive a motion to dismiss, O'Berry's Motion for Judgment on the Pleadings is denied as to Count IX.

IV.     Conclusion

Based on the foregoing, the Motions for Judgment on the Pleadings (Docs. 12, 16) are GRANTED in part and DENIED in part.

Catamount and Smith's Motion for Judgment on the Pleadings (Doc. 12) is granted as to Complaint Count I, for declaratory judgment.  The Court issues a declaratory judgment that: (1) Bailey did not become a shareholder in Catamount because she never purchased shares as required by the Shareholders' Agreement; and (2) Bailey's employment was terminated effective September 18, 2014.

Catamount and Smith's Motion for Judgment on the Pleadings (Doc. 12) is also granted as to Counterclaims Count I, for breach of fiduciary duty; Counterclaims Count III, for breach of Employment Agreement; Counterclaims Count V, for the breach of implied covenant of good faith and fair dealing; and Counterclaims Count VIII, for negligent misrepresentation.  Catamount and Smith's Motion is denied as to Counterclaims Count II, for fraudulent misrepresentation; Counterclaims Count IV, for breach of Shareholders' Agreement; Counterclaims Count VI, for promissory estoppel; Counterclaims Count VII, for unjust enrichment/quantum meruit; and Counterclaims Count X, for defamation against Smith.

Woodin, O'Berry, and Gifford's Motion for Judgment on the Pleadings (Doc. 16) is granted as to Counterclaims Count VI, for promissory estoppel; Counterclaims Count VII, for unjust enrichment/quantum meruit; and Counterclaims Count VIII, for negligent misrepresentation.

Woodin, Gifford, and O'Berry's Motion is denied as to Counterclaims Count IX, for defamation against O'Berry.

      SO ORDERED.

      Dated at Brattleboro, in the District of Vermont, this 18th day of June, 2015.

                      /s/ J. Garvan Murtha
                      Honorable J. Garvan Murtha
                      United States District Judge